35-08/MEU/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
AYRES SHIPPING INC.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger (MU 0045)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

PAKRI TANKERS OU,

                              **08 Civ. 2424 (GBD)**

                  Plaintiff,

    -against-

                                **AFFIRMATION OF**
                                **<u>MICHAEL E. UNGER</u>**

AYRES SHIPPING INC., LASKARIDIS
SHIPPING CO. LTD., LAVINIA CORP.
and RIGA TRANSPORT FLEET,
                           Defendant.
------------------------------------------------------------------------x

MICHAEL E. UNGER, affirms the following under penalty of perjury:

      1.      I am an attorney admitted to practice before this Court and am a member of the

law firm of Freehill Hogan & Mahar, LLP, attorneys for the Defendant AYRES SHIPPING INC.

(hereinafter "AYRES"). I submit this affirmation in support of AYRES's motion for counter-

security pursuant to Rules E(7)(a) and E(2)(b) and in the alternative for vacature of the

attachment obtained by PAKRI TANKERS OU and dismissal of PAKRI's action.

      2.      Insofar as the contents of this affirmation are within my own knowledge, they are

true. Insofar as the contents of this affirmation are not within my own knowledge, they are true

to the best of my information and belief.

3.    Attached hereto as Exhibit A is a true and correct copy of the recent unpublished

decision from the bench issued by Judge Holwell in <u>C Transport Panamax Ltd. v. Pacific Ocean</u>

<u>Resources Ltd.</u>, 06 CIV 11413 (RJH).

Dated: New York, New York
     April 10, 2008

                              MICHAEL E. UNGER

# Exhibit A
# To
# Unger Affirmation

7ci5ctraa.txt

1

7Ci5TRAA                    argument
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  -----------------------------x
2
3  C TRANSPORT PANAMAX, LTD.,
3
4              Plaintiff,
4
5      v.                              06 Civ. 11413 (RJH)
5
6  PACIFIC OCEAN RESOURCES
6  LIMITED,
7
7              Defendant.
8
8  -----------------------------x
9
9                               December 18, 2007
10                              10:09 a.m.
10  Before:
11
11                     HON. RICHARD J. HOLWELL,
12
12                                    District Judge
13
13                     APPEARANCES
14
14  BLANK ROME, L.L.P.
15       Attorneys for Plaintiff
15  BY:   JACK GREENBAUM
16
16  FREEHILL, HOGAN & MAHAR, L.L.P.
17       Attorneys for Defendant
17  BY:   LARRY KAHN
18       MICHAEL E. UNGER
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

⬚                                                                2
    7Ci5TRAA                    argument
1           (Case called)
2           THE DEPUTY CLERK:  Counsel, please state your name for
3  the record.
4           MR. GREENBAUM:  Good morning, your Honor.  I'm Jack
5  Greenbaum of Blank Rome for the plaintiff C Transport.
6           THE COURT:  Good morning, Mr. Greenbaum.
7           MR. KAHN:  Good morning, your Honor.  Lawrence Kahn
8  for the defendant Pacific Ocean Resources.  With me is my
9  partner Michael Unger.
10          MR. UNGER:  Good morning, your Honor.
11          THE COURT:  Good morning.
12          All right.  This is PORL's motion, is it not?
13          MR. KAHN:  That's correct, your Honor.
14          THE COURT:  Do you want to address it?
15          MR. KAHN:  Yes, your Honor.
                         Page 1

7ci5ctraa.txt
16          Defendant PORL is looking for counter-security.  Under
17    Rule E counter-security is to be awarded as a course unless
18    there is some very bona fide reason not to grant it.  And there
19    is no such reason here not to grant the counter-security that
20    PORL is looking for.
21          I'm happy to go through my opponent's memorandum which
22    addresses each element of the counter-security that we are
23    seeking, and it is probably a very handy way to go through
24    this, your Honor.
25          If you look at my opponent's memorandum of law at page
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                    3

7Ci5TRAA                   argument
1     6, point one of his argument is that we should not be entitled
2     to security for a claim arising under another charter party.
3                Strictly speaking, that is what the --
4           THE COURT:  This is the $81,000 claim?
5           MR. KAHN:   That's correct, your Honor, for $81,000.
6           THE COURT:  What charter party does that relate to?
7           MR. KAHN:   It relates to a prior charter party between
8     the same parties, your Honor.
9           THE COURT:  Why isn't Mr. Greenbaum right on that one?
10          MR. KAHN:   I'm not saying he isn't right, necessarily.
11    It is for the same vessel and we have got the same parties
12    here.  It is a permissive counterclaim in these proceedings and
13    under Greenwich, which is a Second Circuit case, Greenwich
14    Marine v. S.S. Alexandra, the Second Circuit held that the
15    inherent power to adapt an admiralty rule to the equities of a
16    particular situation is entrusted to the sound discretion of
17    the district judge sitting as an admiralty judge.
18          THE COURT:  Where is that cited in your brief?
19          MR. KAHN:   That, I'm not sure where -- we may not have
20    cited it, your Honor, but I'm happy to provide the cite.  It is
21    339 F.2d 901 at page 905, Second Circuit 1965.
22          That same holding has been upheld in a case called
23    Sierra Rutile, the cite is 1990 U.S. District lexis 1811 at
24    page star 10, Southern District of New York, February 22, 1990,
25    Judge Keenan, who himself was citing another case called
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                    4

7Ci5TRAA                   argument
1     Commodity Futures Trading Commission which appears at 788 F.2d
2     92, page 94, Second Circuit from 1986.
3           So, the Court has the discretion to grant the
4     counter-security for this $81,000 item under the equities of
5     the situation and I would submit, your Honor, that where we
6     have already made a permissive counterclaim for this element,
7     the parties are already here.  The option is either to award it
8     as counter-security as we are requesting, or we can make our
9     own Rule B application within the same case for the same money
10    for the same element.
11          It seems that it would be wasteful of our respective
12    client's resources as well as the Court's limited resources to
13    come up with a whole new application, especially in a case that
14    has seen a lot of motion practice already over security issues
15    to do what will wind up happening anyway.
16          So, it seems to me that that $81,000 item should be
17    allowed as an equitable consideration.
18          Moving on to point two where my opposition says the
19    defendant is already secured for its claim for withheld charter
20    of $180,115; it is plainly not true, your Honor.
                         Page 2

7ci5ctraa.txt
```
21              THE COURT:  I thought in your reply papers you agreed
22   to the transfer of the funds to a London security?
23              MR. KAHN:  Your Honor, those funds are still sitting
24   in Taiwan.
25              THE COURT:  I understand they're in Taiwan.  My
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                      5

7Ci5TRAA                    argument
```
 1   understanding of your reply papers were that it was perfectly
 2   acceptable to your client for that money to be moved from
 3   Taiwan to London to act as security in the arbitration.
 4              Did I misunderstand your papers?
 5              MR. KAHN:  No, you didn't misunderstand our papers,
 6   your Honor; that's correct.  But, for the time being we are not
 7   secured for that.  These are monies that the plaintiff --
 8              THE COURT:  I understand your position on it.
 9              MR. KAHN:  And I think there is another consideration
10   also, your Honor, if you will just excuse me, that we don't
11   know -- we are willing to have the money moved but we don't
12   know if the Taiwanese Court would allow the movement of those
13   funds.
14              As your Honor may recall, those funds were put up in
15   Taiwan by the plaintiff in order to undo the lien that my
16   client had exercised against cargo.  And so, I don't know if
17   those funds can or cannot be freely moved.
18              But the real point is, of course, that we should have
19   been paid those funds in the first place, not have them put up
20   as security.
21              THE COURT:  That's your argument on the contract.  I'm
22   not sure I agree with you.  And, it is my position to make the
23   Court -- it is up to the London arbitrators to decide.  But,
24   one could read the contract in two different ways.  I don't
25   think that I would view your claims as frivolous but I don't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                      6

7Ci5TRAA                    argument
```
 1   have enough of an understanding of commercial practice in the
 2   area to view them as being a lock cinch either.
 3              As I say, we will leave that to the arbitrators.
 4              MR. KAHN:  Agreed, your Honor.  That should be left to
 5   the arbitrators.
 6              But, I think in the end we are unsecured for that
 7   amount.  Those funds have stayed in Taiwan, they're not moved
 8   to London and they're not secured here either and so we are
 9   unsecured for that amount.
10              Moving on to his point three, counter-security is not
11   available for interest on funds allegedly wrongfully attached.
12              THE COURT:  Now, what amounts are we talking about on
13   this third one?
14              MR. KAHN:  On this we are talking about --
15              MR. GREENBAUM:  Approximately $12,000.
16              MR. UNGER:  Right, the interest.
17              MR. KAHN:  Approximately $12,000 and interest.
18              THE COURT:  What does that $12,000 represent?
19              MR. KAHN:  Your Honor, as you will recall, the
20   plaintiffs restrained a substantial portion of my client's
21   funds for the better part of a year before your Honor found
22   that the grounds for the attachment did not exist and so --
23              THE COURT:  Well, before you moved to modify the
24   grounds or vacate.
25              MR. KAHN:  Well, but for a smaller amount.  They
                           Page 3
```

7ci5ctraa.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

7Ci5TRAA                    argument
1   grabbed $353,000, it was reduced to $100,000, but we did not
2   earn interest on the $353,000 while it was restrained.
3           THE COURT:  How long did it take you to move to vacate
4   the attachment?
5           MR. KAHN:  We moved promptly, your Honor, but it took
6   a long time for the decision to come out.  And so, we think
7   that the then award of the $12,000 is appropriate and it should
8   come either as costs of the prior proceeding -- which we should
9   be awarded as a cost of essentially the restraint of our
10  property for what turned out to be a non-just reason -- or
11  alternatively --
12          THE COURT:  Well, met make sure I understand what you
13  are asking for.  You are asking for an award now or are you
14  asking for security for an award you hope to receive?
15          MR. KAHN:  Well, we are asking for it as security,
16  your Honor, for the time being.  We would rather do it all at
17  once.  We think that that would be the more efficient way to do
18  it.  But, if it makes it easier to simply award us $12,000 in
19  costs now, well then that's fine.
20          THE COURT:  You take it when you can get it.
21          MR. UNGER:  We will take it when we can get it, your
22  Honor; that's exactly right.  But it should be awarded.  It is
23  just is it costs of the prior proceeding or should it be
24  allowed to sit as security for, until the entire matter is
25  resolved.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

8

7Ci5TRAA                    argument
1           THE COURT:  And if it is a matter of security, under
2   what provision is the security available?
3           MR. KAHN:  Under Rule E(2), your Honor, for costs of
4   the proceeding.
5           The next item is on page 8 of my opponent's brief
6   which says counter-security should be limited to the amount of
7   security provided by defendant.
8           What my opponent is proposing is that counter-security
9   should only be allowed on a dollar-for-dollar exchange, and he
10  cites a number of cases in which the parties had roughly equal
11  claims to one another and the Courts in those cases found that
12  a dollar-for-dollar security for counter-security seemed
13  equitable.  However, that's not -- that's not the way that it
14  should be done when there is a lopsided difference between the
15  claims.
16          Here my opponent's claim is roughly $100,000.  Our
17  claim is substantially more and my opponent has been secured to
18  100 percent of his claim.  We have roughly 1 percent of our
19  claim secured -- 5 percent of our claim secured, which is
20  inequitable.  And that is not the way counter-security should
21  work.
22          The cases are consistent that the purpose of
23  counter-security is to place the parties on an equality not to
24  allow for lopsided result.
25          Professor Moore, in Moore's Federal Practice, provides
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

9

7Ci5TRAA                    argument
1   that or says that by allowing such a dollar-for-dollar type of
                            Page 4

7ci5ctraa.txt
2    situation, you encourage a race to the court house by the party
3    with the smaller claim.  And the party with the smaller claim
4    can then come in, secure that amount and limit the amount of
5    security that the party with the larger claim has and that that
6    is not a fair result.  And, such races to the court house are
7    not really in anyone's best interest.
8         The way security and counter-security should work is
9    to put the parties on an equal footing.  The cases are
10   consistent in that regard and there is no reason to think that
11   a dollar-for-dollar situation, as my opponent is suggesting,
12   would put the parties anywhere near to an equal footing.  In
13   fact, it would only favor my opponent.
14        Turning to the next point he raises on page 9, my
15   opponent says that PORL should not be granted counter-security
16   for damages it caused itself.  That's really an unfair
17   characterization.
18        My opponent is claiming that some of the damages that
19   we incurred were a result of our exercising a lien on the cargo
20   in Taiwan --
21        THE COURT:  In a commercially unreasonable manner.
22        MR. KAHN:  Well, right.  That is the point that
23   they're trying to make.  But, the truth of the matter is we had
24   a legal right to exercise that lien.  We took the first steps
25   towards doing that.  It's plainly allowed under English law
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              10

     7Ci5TRAA                    argument
1    which governs the contract.  And I realize the merits are not
2    before your Honor, but the fact of the matter is we have a
3    legal right to do what we did, the Taiwanese court ultimately
4    ruled against us after --
5         THE COURT:  The question is whether or not what you
6    did, assuming you had the legal right to do it, was the
7    proximate cause of any damage you now seek.
8         MR. KAHN:  Well, right, your Honor.  But the issue, I
9    think, is one for the English arbitrators to resolve.
10        As part of our argument goes, that is not really the
11   root cause of the damage.  The root cause of the damage is our
12   opponent (1) not paying the funds when they were due as
13   required under the contract.
14        THE COURT:  That is the $180,000 claim.
15        MR. KAHN:  That's correct, your Honor; and then (2)
16   for commencing a litigation in Taiwan which was totally
17   inappropriate under the charter party as well.  All disputes
18   were to be resolved in London by arbitration and by commencing
19   litigation in Taiwan.  That's what started the ball rolling and
20   causing the damage; that what our opponent should have done was
21   either paid the funds that were due or come up with reasonable
22   terms for the escrow.
23        THE COURT:  What was the gravamen of the suit in
24   Taiwan?
25        MR. KAHN:  I'm sorry?
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              11

     7Ci5TRAA                    argument
1         THE COURT:  What was the gravamen of the suit in
2    Taiwan?
3         MR. KAHN:  Our opponents were claiming that the vessel
4    was not meeting its speeding performance and so --
5         THE COURT:  And that was the gravamen of the statute?
6         MR. UNGER:  No.
                        Page 5

7ci5ctraa.txt
7          MR. KAHN:   No, your Honor.  We had not been paid our
8    charter hire --
9          THE COURT:  Right.
10          MR. KAHN:   -- and so we exercised a lien on cargo
11    because once the cargo is distributed, we lose our lien.
12          THE COURT:  So, the suit was simply to have the lien
13    released?
14          MR. KAHN:   That's correct, your Honor; was to defeat
15    the lien.
16          And so, that is what we hold caused the problem and
17    not our own action in exercising the lien which we had a legal
18    right to do.
19          But again, your Honor, all of this is for the English
20    arbitrators to decide.  And, in fact, we made the same argument
21    from the opposite point of view in opposition to the plaintiffs
22    application to amend the complaint to add a new claim for
23    damages that were not in his original complaint.  And so in
24    the -- you know, we said that the fees in Taiwan should not
25    have been recoverable because they caused those damages
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    12
7Ci5TRAA                  argument
1    themselves and the Court awarded security against my client for
2    that.
3          So, it would seem that the opposite should be true as
4    well.  The plaintiff should not be allowed to argue the same
5    thing that we argued and defeat our request for security when
6    the opposite result didn't occur in just the last application
7    before this Court involving these same parties.
8          My opponent's next argument concerns whether or not
9    they should be permitted to go forward with their main claim in
10    London and there the law is very clear, that until
11    counter-security is posted the plaintiff is restrained from
12    going forward with his main claim.  Straight out of the rule.
13          In the Daeshin matter in front of Judge Buchwald which
14    was, in fact, the very same attorneys you have before you here,
15    argued the exact same position.  Judge Buchwald held that in
16    fact this Court does have the power to prevent a plaintiff who
17    has come before it seeking security from proceeding on its main
18    claim even if that main claim is in arbitration in a foreign
19    country -- here England -- and until the counter-security is
20    posted.
21          The law is clear on that.  There has never been any
22    position to the contrary so I think that, in sum, each of the
23    elements of the counter-security that we have requested are
24    supported, none are frivolous, the arguments raised by our
25    opposition do not stand up.  And until counter-security is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    13
7Ci5TRAA                  argument
1    posted, the plaintiff should be prevented from going forward
2    with its main claim in London which I would point out is
3    actually the counterclaim in London because we were the ones
4    who filed for arbitration in London against them.
5          THE COURT:  What is happening in London?
6          MR. KAHN:   The arbitration is proceeding but very
7    slowly.  I think that the parties there --
8          THE COURT:  Has a panel been appointed?
9          MR. KAHN:   Yes, a panel has been appointed.
10          I think that, in truth, your Honor, I think that the
11    solicitors in London are waiting, essentially, to see what
                           Page 6

7ci5ctraa.txt
12      happens here in terms of security because, I think, it is not
13      unreasonable to imagine that if the Court was to award the full
14      amount of security that -- counter-security that we are
15      seeking, that that very well might stimulate a settlement
16      because the task of putting up that amount of security before
17      the plaintiff here, defendant there, would be able to go
18      forward.  It just makes the situation ripe for resolution.
19              And so, I --
20              THE COURT:  What is the cost of a $50 million security
21      in a matter like this?
22              MR. KAHN:  What is the cost?
23              THE COURT:  Cost.
24              MR. KAHN:  Well, I think that what would likely
25      happen, your Honor, is our opponent would probably put the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    14
7Ci5TRAA              argument
1       money up in cash in escrow in London.  There they can earn
2       interest on such funds as opposed to here.  And so, rather than
3       put up a bond where you would have to not only put up the exact
4       same amount of cash, you would also have to pay probably about
5       10 percent more just to buy the bond.  It is cost prohibitive,
6       your Honor.
7               So, I would think that they would put up cash in
8       London or perhaps some guarantee from an insurance club.  That
9       sort of thing.
10              THE COURT:  And how should the Court apply the
11      countervailing concern on counter-security cases of not
12      providing security or counter-security that's unduly burdensome
13      on the plaintiff such as that it might cause the plaintiff to
14      be unable to bring suit originally?
15              MR. KAHN:  Your Honor, I appreciate the point.
16              All of those cases concern seamen who brought forth a
17      claim for, say, personal injury or unpaid wages, that sort of
18      thing, and a counterclaim by the ship owner for damage than the
19      seaman did to the ship and millions of dollars and that it was
20      so prohibitive that the plaintiff would not have been able to
21      seek justice in the first place.
22              That is not the case here.  These are large commercial
23      organizations putting up that amount of security.
24              I realize it's -- I realize a few million is not chump
25      change but it is certainly something that the plaintiff should
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    15
7Ci5TRAA              argument
1       be able to provide.  What is more, there is no argument by the
2       plaintiff that they would be unable to pay those monies.
3               THE COURT:  All right.  Let me hear from
4       Mr. Greenbaum.
5               MR. GREENBAUM:  Thank you, your Honor.
6               I think I'm going to begin with a point that I think
7       is actually irrelevant but it has been put into issue, and that
8       is the point of who commenced the arbitration.  Since receiving
9       the reply brief from my opponents I have been told our side
10      actually commenced the arbitration and I have that exchange of
11      correspondence with me if the Court cares to see it.  But, if
12      the Court agrees that it is irrelevant, then I won't burden you
13      with it.
14              THE COURT:  Its relevance doesn't jump out at me.
15              MR. GREENBAUM:  Thank you.
16              Then, as to the merits, I would like to begin with the
                            Page 7

7ci5ctraa.txt
17  largest claim because I think that's really why we are here,
18  and that's the claim for charter hire and bunkers and so forth
19  while the ship was sitting around in Taiwan.
20          THE COURT:  That's about a million dollars.
21          MR. GREENBAUM:  That's correct.  It is nine hundred
22  and something, your Honor; seven hundred and something for the
23  charter hire and another hundred and something for fuel oil.
24  On that I would like to begin by reading some passages from the
25  declaration, the reply declaration by Julian Pierce -- that's
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

16

7Ci5TRAA                argument
 1  the solicitor for the defendant -- because I think it tells us
 2  something.  It tells us why we are here.
 3          At paragraph 15 on page 6, last sentence of paragraph
 4  15, "There is simply no authority for the proposition that an
 5  owner must act reasonably in asserting its lien rights and any
 6  discussion of unreasonableness is irrelevant."
 7          And again, at paragraph 18, "The literal wording of
 8  clause 18 does not make PORL's exercise of lien conditional on
 9  it being commercially reasonable, only on there being sums due.
10  It follows that in order to succeed, C Transport would need to
11  persuade the tribunal to imply a novel implied term."
12          So, to Mr. Pierce reasonableness is not to be implied.
13  It is a novel concept to him.  That's why we are here, Judge.
14          THE COURT:  Well, from their perspective they would
15  say they're here because your client made unreasonable demands
16  as to the form of the escrow that you offered.
17          MR. GREENBAUM:  Judge, they haven't shown that.  I
18  mean, that's outside the record.  I could respond to that.  I
19  could tell you that I'm informed, they agreed.
20          THE COURT:  That's one of the problems that the Court
21  in an attachment proceeding has is the merits, if you will, are
22  generally outside the record.
23          MR. GREENBAUM:  Well, that's --
24          THE COURT:  Which is why you tend to leave it to the
25  arbitrator.
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

17

7Ci5TRAA                argument
 1          MR. GREENBAUM:  What they can't argue against is that
 2  the security is there in Taiwan.  They haven't shown that that
 3  doesn't stand as security.  And, I have cited cases to you that
 4  say that security held in other countries is security.
 5          Continuing, since I did not have an opportunity for a
 6  sur-reply of course I would like to read some passages from an
 7  English Court of Appeals decision which I can hand up and give
 8  to the opponent.
 9          May I hand this up?
10          THE COURT:  Yes.
11          MR. GREENBAUM:  The name of this case is Federal
12  Commerce and Navigation Limited v. Molina Alpha Incorporated --
13  and it is also known as the NANFRI, which is one of the slips
14  that was involved.  It is reported at volume 2 of the 1978
15  Lloyd's Law Reports at page 132.
16          Now, the first passage I want to read goes to this
17  argument by Mr. Pierce, the defendant's solicitor, that the
18  exercise of a lien is to obtain payment and not to obtain
19  security.  This passage deals with a lien on subfreights --
20  that's lien on money payable to a middle charterer, but the
21  principal is the same for any lien.
                         Page 8

7ci5ctraa.txt
22          At page 142 in the next to the last paragraph in the
23  right column:  "The owners sought to justify their threat by
24  reference to the lien clause 18 in the charter party as if that
25  excused it but it did nothing of the sort.  In order to
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

18

7Ci5TRAA                    argument
1   exercise a lien on subcharter freight they would have had to
2   give notice to the subcharterers with the likely consequence
3   that the subcharterers would place the amount of freight in
4   joint hands pending a decision as to whether the ship owners
5   were entitled to it.  A lien does not give a parties a right to
6   the money.  It is only a security for sums properly due.  So,
7   the ship owners would be no better off than they would have
8   been if they had accepted the charterers' counter-offer to
9   place the amount of the disputed deduction in escrow."
10          Now, Judge, you will recall that was precisely our
11  argument on two out of the four motions.  And Mr. Pierce swore
12  up and down that the law in England is the to the contrary.
13          Now, there is another passage I'm going to read
14  although your Honor has recognized the issue about whether a
15  charter party clause permits deductions and what deductions it
16  permits.  I think you should have the benefit of the Court's
17  comment in the same case at page 141, bottom paragraph:
18          Now I come to cases where the ship owner has not been
19  guilty of any breach of contract or its is protected by
20  exceptions clauses.  In such cases the charterer is often given
21  a right of deduction by express clauses such as the off hire
22  clause for a clause allowing deductions for disbursements.
23  There is no doubt that the charterer can make the deduction but
24  the question is when.  Have they to be agreed or established
25  before he can make the deduction?  There is no authority that I
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

19

7Ci5TRAA                    argument
1   know of to that effect.  It seems to me that he is entitled to
2   quantify his loss by a reasonable assessment made in good faith
3   and deduct the sum so quantified from the hire.  Then the
4   actual figures can be ascertained later either by agreement
5   between the parties or failing agreement by arbitration.  That
6   was what the parties did in the present case for the first
7   three years of the charters.  The right to deduct would be
8   useless to the charterer if you had to wait until a figure was
9   agreed or established, for then it might be postponed
10  indefinitely.
11          And there are similar comments in the decision.
12          Now, I will point out that this case was affirmed by
13  the House of Lords on completely different grounds, and the
14  House of Lords expressly did not address the issue of
15  deductions.  I can give you the House of Lords citation.  It is
16  the Volume 1 of the 1979 edition of Lloyd's Law Reports at page
17  201.  And I have it if you and counsel would like a copy.
18          But, the point I am making here is that as far as I
19  know, no House of Lords decision has addressed that point so
20  that the highest court in England who has addressed it is the
21  Court of Appeals in the decision I read to you.
22          The significance isn't that I'm trying to get you to
23  decide the merits because you are not going to.  The
24  significance is that the opinion, this expert opinion of
25  Mr. Pierce never suggests any of these points that the Courts
            SOUTHERN DISTRICT REPORTERS, P.C.
                    Page 9

7ci5ctraa.txt
(212) 805-0300

20

7Ci5TRAA                    argument
1   have held.  I mean, it is obviously not an objective opinion,
2   it is an expert opinion, it is an advocate's opinion.  That's
3   his right.  But, even as an advocate I think he has to point
4   out a Court of Appeals decision that is directly on point.
5           And, in case there is any doubt about the currency of
6   the decision despite the House of Lords not addressing it, I
7   will read from the English law section of Time Charters which
8   was published in 2003.  That's a very well known and much used
9   textbook on time charters.  It contains chapters set up so that
10  there is an English chapter -- English law chapter and an
11  American law chapter.
12          In the English law chapter at page 267 the authors
13  state:  The charterers may deduct from payments of hire those
14  amounts specifically permitted by the terms of the charter,
15  thus advances for ship's disbursements under lines 65 and 66 of
16  the New York Produce form shall be deducted from the hire.  And
17  he cites a case I won't cite.
18          Then he goes on to say -- and this is relevant to the
19  present case -- "The same is true in lines 99 to 101 of that
20  form in respect of time lost, fuel consumed and expenses
21  incurred as a result of a reduction in speed caused by a defect
22  in or breakdown of the ship's hull, machinery or equipment."
23          I'm going to skip over some passages that talk about
24  offhire because we are not discussing that.  And then they go
25  on to say, "Permitted deductions may be made from a subsequent
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

21

7Ci5TRAA                    argument
1   hire payment even though the amount of the deduction has not
2   previously been determined by arbitrators or agreed with the
3   owners."
4           And he goes on to discuss the NANFRI decision that I
5   read from.
6           Now, as to the reasonableness of what they did, apart
7   from the fact that I think it is pretty self-evident it was not
8   reasonable, not only were they fully secured for the $180,000
9   that my client had offered to place in escrow in London, they
10  were fully secured because my client placed $193,000 in the
11  Court in Taiwan as a condition of obtaining the order to
12  discharge the cargo.  Not only were they unreasonable because
13  they were fully secured, but they were unreasonable because
14  they disobeyed the Court's order three times.  I don't know how
15  anybody could think otherwise than that.
16          They brought this on themselves and I have cited to
17  you the cases that hold that this Court has every right and
18  should address, consider undisputed facts that go to the
19  question of mitigated damages, and these are facts that are not
20  disputed.  The conclusions, of course they're disputed.  The
21  facts are not disputed.
22          It may be a bit superfluous but I will also mention
23  that the ship was away from the port for a week undergoing
24  repairs and that's certainly the ship owner's time, not the
25  charterer's time.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

22

7Ci5TRAA                    argument
1           And now I, if I may, I will come back to the other
2   claims in the order of the way they were discussed in my brief
                          Page 10

7ci5ctraa.txt
```
 3   and by the adversary.
 4           THE COURT:  Yes.
 5           MR. GREENBAUM:  The $81,000 claim; with all respect,
 6   it is not the function of the Court to determine whether or not
 7   the other side will file another lawsuit and, as a general
 8   matter on all these claims, it is not the function of the Court
 9   to issue an order for counter-security because it might
10   encourage a settlement.  I don't think there is any argument
11   about that.
12           THE COURT:  But, if this is a counterclaim now in this
13   lawsuit, even if it is a permissive counterclaim, what is the
14   advantage to ignoring it at this juncture?
15           MR. GREENBAUM:  I don't know whether it will be
16   ignored, Judge.  I have never taken up with my client whether
17   the $81,000 will be placed in escrow voluntarily.  I am just
18   opposing the motion.
19           And, the discussion about equity has nothing to do
20   with this case.  We could all have cited a dozen more court
21   cases that say equity courts have equitable powers but they
22   have nothing to do with this.
23           For example, a court does not have the equitable power
24   to issue an injunction and this is essentially an affirmative
25   injunction that they're asking for, and that's in the Groupo
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                  23
7Ci5TRAA            argument
```
 1   Mexicano case.  That was held by the security in the Groupo
 2   Mexicano case.  I'm afraid I don't have a cite for that now.
 3           The point, really, is counter-securities are governed
 4   by Rule E(7), and Rule E(7) says counter-security can be
 5   granted for claims arising out of the same transaction.  That's
 6   where the power of the Court is derived from.
 7           On the $181,000 withheld from hire, I have touched on
 8   that.  The defendant's argument is that they're not secured but
 9   they haven't shown why they're not secured.  The money is there
10   in court in Taiwan.  They haven't showed that if they succeeded
11   in arbitration that money would not be available to them.  They
12   say there is no showing that the Taiwan Court will transfer the
13   money.
14           There is always a mechanism.  If the parties, just as
15   in this Court if the parties stipulate to the release of money
16   into the hands of a lawyer, the Court is not going to say no.
17   And then the lawyer will take care of the money pursuant to
18   whatever the escrow agreement is.
19           Interest on the funds is wrongfully attached.  On that
20   all I wanted to bring out was that UBS and I submitted to the
21   Court an order to pay that money into the Court's
22   interest-bearing CRISA account but that was overtaken by the
23   defendant's motion to vacate the attachment on the grounds that
24   the money wasn't here.
25           So, we have this dilemma.  Can you pay money into the
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                  24
7Ci5TRAA            argument
```
 1   New York registry if the money isn't really here?
 2           So, it couldn't be paid in but we did try to put it --
 3   we meaning myself and the garnishee -- did try to put it in an
 4   interest-bearing account.  At that point in time, to make it
 5   clear, the defendants had not appeared by counsel.  I'm not
 6   suggesting that they refused, only that they -- I think that
 7   they could not do it in view of the nature of their motion.  I
```
                              Page 11

7ci5ctraa.txt
 8    don't recall whether or not we actually discussed it.
 9         Limitation on the amount.  I think their argument that
10    they're entitled to 100 percent of their claim, $2 million,
11    argues against them, not for them.  Where is the equity in one
12    party having $100,000 in security and the other part having $2
13    million in security?
14         THE COURT:  The equity, from their perspective, flows
15    from the fact that you would both be 100 percent secured.
16         MR. GREENBAUM:  It was a rhetorical question, Judge.
17         I understand both sides of the argument and I think
18    that clearly in this case, in my mind, the rule that I think is
19    more often applied to limit the amount of the counter-security
20    would be plainly applicable here.  I should point out again
21    that they have that security already.  They have more security
22    than we have so no additional security should be granted.
23         THE COURT:  I'm not sure I follow you.
24         MR. GREENBAUM:  They have $193,000 in Taiwan.
25         THE COURT:  Yes.  I understand that.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                 25
      7Ci5TRAA                 argument
 1         MR. GREENBAUM:  We have $100,000.  They have more
 2    security than we do.
 3         Really, I think we've touched on everything.
 4         THE COURT:  Yes, I think we have.
 5         MR. GREENBAUM:  Thank you, Judge.
 6         THE COURT:  Mr. Kahn, is there anything that you want
 7    to briefly say in reply?
 8         MR. KAHN:  Yes, your Honor.  Very briefly.
 9         For one thing, I just want to correct a few issues
10    that I think my opponent may have misspoken on.
11         One.  The facts underlying the dispute between the
12    parties are in dispute.  I think my opponent said that they
13    were not.  And, while certain elements are certainly agreed
14    facts, I don't want to let it rest that there are no facts in
15    dispute.
16         Two.  My opponent mentioned the Groupo Mexicano case
17    for the proposition in opposition that the Admiralty Court does
18    not have the power to grant injunction.  I'm afraid that my
19    opponent is incorrect on that point as well.
20         Groupo Mexicano was a case in which an attempt was
21    made here in order to obtain what is popularly known as a
22    Mareva Injunction, a worldwide injunction.  The basis, just
23    basically, of such an injunction, is that if the party has
24    voluntarily come before the Court or if the Court has personal
25    jurisdiction over the defendant, the Court can order the
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                 26
      7Ci5TRAA                 argument
 1    defendant to do things wherever in the world that may be.
 2         The Second Circuit -- no, I'm sorry the Supreme Court,
 3    I believe -- it is one or the other, your Honor, I'm sorry, I
 4    wasn't anticipating this argument -- but, at any rate a higher
 5    Court held that a Mareva Injunction is not available here
 6    because that is something that arose under the laws in England
 7    after we broke way from them but that it was simply that type
 8    of an injunction that was not available, not injunctions
 9    generally.
10         So, correcting those two issues I'm not sure what to
11    make of the English law material that my opponent has handed
12    out today.  I don't see any reason why it couldn't --
                            Page 12

7ci5ctraa.txt
13          THE COURT:  Sounds like you have a weak case in
14   London.
15          MR. KAHN:  Your Honor, I disagree.  I don't think so.
16   And our solicitor doesn't think so either.
17          And, as far as the reasonableness aspect, my opponent
18   has taken small snippets of things instead of putting the
19   matter in context.  It is not that you have a right to be
20   unreasonable.  That's not what our London solicitor is saying.
21          What he is saying is that reasonableness is not the
22   factor that you look at as to whether or not you have a right
23   to lien the cargo.  It is simply not one of the elements that
24   needs to be demonstrated.  Not that there isn't some other
25   obligation to be reasonable, but that whether or not you have a
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                27
7Ci5TRAA                argument
1    lien right doesn't hinge on that question.
2          And so, our London solicitor has submitted a
3    declaration under penalty of perjury that says, under English
4    law, these are our client's rights.
5          The merits are not before you, your Honor.  The
6    attempt to argue English law is an attempt to argue the merits.
7    We attempted to argue the merits that our opponent should not
8    be able to recover the $50,000 in legal fees that they spent in
9    Taiwan on the basis that the Taiwanese Court didn't award it
10   and there was no basis for recovering it in London.
11          There, again, a very strong case that they could not
12   ever recover those $50,000, yet this Court made the decision
13   that whether or not the case seemed to be strong to a group of
14   Americans was irrelevant.  It is a matter for the English
15   solicitors to decide.
16          The same applies here.  A group of Americans looking
17   at bits and pieces of English law and trying to figure out what
18   it says, what it means, the particular way in which a solicitor
19   has drafted a statement, all of this goes to the merits, your
20   Honor, which is properly decided by the arbitrators in London.
21          If our case in London fails, it fails.  But, that's
22   not an issue for this Court to be concerned about in a request
23   for counter-security which is supposed to be provided under the
24   clear wording of the rule.
25          And, finally, the issue of the $180,000 or $193,000 in
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                28
7Ci5TRAA                argument
1    Taiwan.  I would like to point out, (1), it is the plaintiff's
2    burden to show that those funds can or cannot be moved to
3    secure the counterclaim made here.  Those funds have been in
4    Taiwan for a very, very long time and they have not been moved
5    and there has got to be some reason for that.  And if they were
6    so easily moved, it should have been done by now and it hasn't.
7    And all I'm submitting, your Honor, is that the proof has not
8    been demonstrated --
9          THE COURT:  I'm not clear then on that one hundred
10   eighty-some-odd thousand dollars whether you are essentially
11   seeking double security.
12          MR. KAHN:  We are not, your Honor.  That does not
13   secure us.  That was money that the plaintiff had to put up in
14   Taiwan in order to defeat the lien.  That is money they
15   voluntarily put up.  That does not secure us.
16          THE COURT:  What does it secure?
17          MR. KAHN:  It secured the release of the cargo to
                        Page 13

7ci5ctraa.txt
18   China Steel which was the cargo receiver.
19              THE COURT:  But security in favor of whom?
20              MR. KAHN:  Unclear, your Honor.  And especially since
21   that case now is essentially resolved.  There is nothing left.
22              THE COURT:  Security has to be in favor of some party
23   so it has to be in favor either, I would assume, either of your
24   client or conceivably the China Steel company.
25              MR. KAHN:  Well, your Honor, it was meant to be.  But
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    29
     7Ci5TRAA                    argument
1    now that that case is resolved that money reverts back to the
2    plaintiff.  And now the fact that the plaintiff has kept it
3    there and has not done anything with it I can't speak to.
4               But, plaintiff did offer to put the money up in an
5    escrow account in London but attached to it such prohibitive
6    terms that our client couldn't agree to --
7               THE COURT:  Are you talking about a year ago?
8               MR. KAHN:  That's correct, your Honor.
9               THE COURT:  I'm not interested in that.
10              MR. KAHN:  Okay.  Well, the issue, though, is that
11   these funds are the funds -- those funds were meant to secure
12   the release of the cargo while that case was ongoing in Taiwan.
13   The cargo is gone.  The lien is extinguished.  The Taiwanese
14   Court held that the lien -- the lien couldn't stand.  And, as
15   far as my client disrespecting the Taiwanese Court's order,
16   again, not true.
17              The only way you can hold on to a lien is by holding
18   on to the cargo.  So, we held on to the cargo while we
19   appealed, while we tried to resolve the matter.
20              THE COURT:  We have been through that before.
21              MR. KAHN:  Okay.  Thank you, your Honor.
22              THE COURT:  Thank you, counsel.
23              The Court is going to grant, in part, the motion for
24   counter-security while I have reservations about some of the
25   actions of PORL.  As I noted during argument, those are issues
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    30
     7Ci5TRAA                    argument
1    for the London arbitrators to decide.
2               PORL moves for counter-security on its counterclaim
3    under Rule E(7)(a).  While counter-security is ordinarily
4    available under the rule it is, nevertheless, a matter within
5    the broad discretion of the Court and the Court should consider
6    countervailing principles of placing parties on equal footing
7    regarding security and of avoiding the imposition of burdensome
8    costs on plaintiffs that might otherwise preclude them from
9    bringing suit.  Result Shipping v. Ferruzzi Trading, 56 F.3d
10   394, 399, (2d Cir. 1995).
11              In this case, C Transport opposes the motion arguing
12   that PORL was acting in a commercially unreasonable manner in
13   exercising a lien on a portion of the steel shipment while in
14   Taiwan.  C Transport also argues that PORL's underlying claims
15   for damage for charter hire and fuel are weak in that they are
16   self-inflicted wounds.  And, finally, C Transport argues that
17   counter-security, if given, should be limited to the amount of
18   security that C Transport itself received on its claim which
19   is, I believe, about $110,000.
20              MR. GREENBAUM:  $101,000 and a few hundred, Judge.
21              THE COURT:  While the arbitrators in London may
22   ultimately conclude that PORL's exercise of a lien was
                              Page 14

7ci5ctraa.txt
23  unreasonable, and for this as well as other reasons that PORL's
24  underlying claims might be rejected this Court on the limited
25  record before it, it does not find itself in a position to
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

31

7Ci5TRAA            argument
1   conclude nor does it really have the jurisdiction to conclude
2   that PORL acted in such bad faith so as to warrant denial of
3   the provisional remedy of counter-security that's ordinarily
4   available.  Nor does the Court conclude that its claims are so
5   frivolous as to preclude counter-security.
6          The outcome of the claims made by PORL is surely
7   uncertain but this, itself, is not a sufficient reason to deny
8   PORL's motion.
9          Finally, while the amount of the security provided on
10  the original claim is a factor to be considered, the Court does
11  not find it conceptually inequitable to provide greater
12  security for defendant's counterclaims which, after all, have a
13  substantially higher value and because plaintiff's claim is of
14  lower value and has been completely secured.  Therefore, the
15  Court rejects this basis or this defense raised by C Transport
16  in opposing the motion for counter-security.
17         As to the amount of security to be provided on
18  counterclaims, the Court, at this juncture, will not provide or
19  grant security relating to the $81,000 claim against C
20  Transport arising out of a different charter party in that it
21  obviously did not arise out of the same transaction.  Perhaps,
22  with a fuller record on that issue, the Court will ultimately
23  grant security but elects not to exercise its discretion to do
24  so today.
25         The Court will also reduce the amount of security
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

32

7Ci5TRAA            argument
1   ordered by the $180,000 or $184,000 subject to security
2   currently in Taiwan provided that, within 30 days, that
3   security is essentially moved from Taiwan to London.
4          The Court will provide for security for the $12,000 of
5   the costs alleged to be incurred during the prior attachment
6   proceedings.
7          With respect to the principal amount of the
8   counter-security on the claims for charter hire and claims for
9   victualing as well as interests and costs, I am uncertain as to
10  the exact amount, Mr. Kahn, to order, because you have not
11  addressed the issue of whether or not the vessels were in fact
12  in dry dock for eight days out of the period of October 26 to
13  December 11.  Mr. Greenbaum's argument seems reasonable and I
14  am hesitant to provide greater security than is warranted here.
15         So, I would like you to provide Court with an
16  understanding as to whether you contest that the ship was in
17  dry dock for eight days and therefore that the amount of
18  security should be proportionately reduced.
19         MR. KAHN:  Your Honor, we are going to need to get the
20  exact information from the client on that.
21         THE COURT:  All right.  How long do you think that
22  would take?
23         MR. KAHN:  A week.
24         THE COURT:  All right.
25         MR. GREENBAUM:  Your Honor, if I may clarify?  The
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                          Page 15

7ci5ctraa.txt

7Ci5TRAA                    argument
1   entire time wasn't spent in the -- undergoing repairs.  The
2   ship was actually detained by the yard for non-payment or late
3   payment.
4               THE COURT:  I'm not sure I follow that.  It was in --
5               MR. GREENBAUM:  It was in the shipyard for repairs.
6               THE COURT:  For eight days?
7               MR. GREENBAUM:  It was in the shipyard for eight days.
8   The repairs were fewer than eight days but the ship couldn't
9   sail until it paid the bill to the shipyard.
10              THE COURT:  And whose obligation was it to pay?
11              MR. GREENBAUM:  The vessel.  The defendant.
12              THE COURT:  All right.  In other words, it was not
13  able to be hired during that period of time.
14              MR. GREENBAUM:  That's correct.  I just didn't want to
15  be seen as misrepresenting.
16              THE COURT:  I understand.
17              Mr. Kahn, I'm going to ask you to prepare a proposed
18  order in this case, and with your proposed order submit a cover
19  letter addressing the issue of whether or not your requested
20  security should be reduced by this eight-day period while the
21  ship was in dry dock for whatever reason it was in dry dock.
22              MR. KAHN:  Understood, your Honor.  Thank you.
23              THE COURT:  All right.
24              So, that the security to be provided would be the
25  $768,000 for charter hire, the $194,000 for victualing subject
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

7Ci5TRAA                    argument
1   to an eight-day proportional deduction, and then interest and
2   costs of $600,000 and $12,000 for legal costs.
3               Now, I will ask Mr. Kahn to present a proposed order
4   with copy to Mr. Greenbaum for his comments prior to submission
5   to the Court.  Then if you disagree, Mr. Greenbaum, with the
6   proposed order, then of course you should submit a
7   counter-proposed order.
8               With respect to the issue of injunction staying the
9   London proceedings, first I'm not sure that that issue is even
10  ripe until such time as plaintiff indicates it is not going to
11  provide security.  If I understand what PORL is requesting, it
12  is a stay of a proceedings in the absence of security.
13              So, I think the ball is first in Mr. Greenbaum's court
14  to discuss with his client whether his client intends to
15  provide security.  And if it does not, then I will consider the
16  stay issue.
17              MR. KAHN:  Your Honor, if I may?
18              I hate to interrupt, but looking at the literal
19  wording of rule E(7)(A) the very last sentence of that rule
20  provides that proceedings on the original claim must be stayed
21  until the security is given unless the Court directs otherwise.
22              THE COURT:  Well, is anything going on now?  Is there
23  anything to stay?
24              MR. KAHN:  Well, your Honor, the panel in London has
25  been impaneled and so, conceivably, the parties could move
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

7Ci5TRAA                    argument
1   forward with their respective claims in London.  And so, I
2   mean, if the question is is something going to happen during
3   Christmas week, the answer is probably not.
                        Page 16

```
                          7ci5ctraa.txt
 4              THE COURT:  Well, I'm going to await Mr. Greenbaum's
 5     submission in a week's time as to what his client's intentions
 6     are regardless of the language any Court, I believe, should be
 7     hesitant to enjoin another by, and do so only when firmly
 8     convinced that it is necessary.
 9              MR. KAHN:  Understood.  Thank you, your Honor.
10              THE COURT:  All right.  Is there anything else that we
11     need to address this morning, counsel?
12              Thank you for coming in.
13                              o0o
14
15
16
17
18
19
20
21
22
23
24
25
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300