35-08/MEU/SL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

PAKRI TANKERS OU,

                        Plaintiff,

     - against -

AYRES SHIPPING INC., et. al.,

                        Defendant.

--------------------------------------------------------------x

**08 CV 2424 (GBD)**

**DECLARATION OF
KEVIN SACH IN
FURTHER SUPPORT**

KEVIN SACH, declares and says as follows:

1.    I am a solicitor of the Supreme Court of England of Wales and the founding partner of Sach Solicitors of 24 Alie Street, London, E1 8DE, England. I was admitted as a solicitor in 1986, and was previously a partner at shipping law specialists, Hill Taylor Dickinson. I have the conduct of this matter in respect of the London arbitration pending between AYRES SHIPPING INC. ("AYRES") and PAKRI TAKERS OU ("PAKRI").

2.    I submit this Declaration in Further Support of the motion filed by Defendant AYRES for counter-security or alternatively to vacate the attachment obtained by PAKRI.

3.    I make this Declaration based upon my own personal knowledge obtained from a review of documents in my file and I am duly authorized by AYRES to make this Declaration on its behalf. To the extent this information provided below is not within my own knowledge, I believe it to be true and correct.

NYDOCS1/303650.1

4.    In order to obtain security for claims arising our of PAKRI's breach of a maritime contract of charter party for the vessel M/T FORTUNE, AYRES filed an action with this Court captioned "Ayres Shipping Inc. v. Pakri Tankers, 08 Civ. 554 (GBD)" seeking security pursuant to Rule B up to approximately $2.2 million. This relief was granted and AYRES restrained approximately $222,000 in property in which PAKRI had an attachable interest.

5.    Notwithstanding the fact that PAKRI's claims against AYRES should have been asserted as a counterclaim in the first filed action, PAKRI commenced separate Rule B proceedings against AYRES as well as three alleged alter egos of AYRES. PAKRI ultimately succeeded in restraining multiples of the approximate $3.75 million which PAKRI sought as security for its claims in the arbitration.

6.    In order to prevent the restraint of its funds and the further restraint of additional funds of the alleged alter egos, AYRES arranged to post a bond issued by Ace Europe dated March 26, 2008 in the sum of $3,749,086.40. A copy of the bond is attached hereto as Exhibit A.

7.    I note that PAKRI's counsel indicates at ¶16 of his Declaration dated April 21, 2008 that the bond issued by Ace Europe "prohibits Pakri from publishing the letter to the Court without a Court order". No such language appears in the bond issued by Ace Europe. There is however a confidentiality clause which says that its terms are not to be divulged except in response to a court order, but the meaning and intention of this was with regard to disclosure to non-parties.

8.    I further note that PAKRI's attorney suggests at ¶16 of his Declaration and at point VI of PAKRI's Brief that the forum selection clause in the bond bars this Court



from adjudicating any dispute about the security. This is incorrect both as a matter of fact and as a matter of English law. First, the bond specifically states that it was given "without prejudice to any and all rights and defenses of Ayres Shipping Inc. and the other named Defendants in relation to both the New York Attachment proceedings and the London arbitration." Further, Ace Europe's obligations under the bond were subject to certain enumerated provisos including that "if any Court of competent jurisdiction enters an order ruling that any order of attachment in the captioned matter (noted to be "Pakri Tankers OU v. Ayres Shipping Inc., et. al., United States District Court, Southern District of New York, 08 CV 2424 (GBD)) is vacated, void or reversed, then the guarantee shall be null and void and of no effect." Accordingly, the bond specifically reserves to the Honorable New York Court the power to decide the instant application to vacate the attachment.

9.      While the bond provides that it is to be "construed in accordance with English law and any dispute arising out of or in connection with it shall be determined by the High Court of Justice in London", the bond specifically reserved to this Honorable Court the right and ability to determine whether the order of attachment issued in favor of PAKRI should be vacated or reduced. Accordingly, this is not a dispute concerning the bond as PAKRI wishes to paint it, but rather a dispute concerning the validity and propriety of the issuance of the order of attachment in the first place.

10.     I am informed that in this regard, the Court's equitable powers are invoked. It is my further understanding that in determining equitable issues the Court should be permitted to judge the credibility of the parties. To that end, I wish to bring to the Court's attention that in connection with the arrest of bunkers (fuel) on three different

3



vessels which had been time chartered by Defendant PAKRI in Rotterdam and Antwerp on March 28, April 1 and April 6, 2008, PAKRI attempted to have the arrests lifted on the grounds that the fuel was not owned by PAKRI but rather owned by Baltic Tankers, another company owned and controlled by Mr. Savins who provided a declaration on behalf of PAKRI in this action. See Exhibit B attached hereto. It should be noted that the Rotterdam and Antwerp courts refused, after a contested hearing, to accept that Pakri was not the true owner of the bunkers, despite Pakri's efforts to persuade them to the contrary with documents that appear to have been generated purely for that purpose.

11.    In support of its application to dismiss the action commenced by AYRES against PAKRI in the Courts of Estonia which sought to freeze PAKRI's bank accounts PAKRI submitted evidence attesting, under oath, that the bunkers which had been arrested on the three ships in Rotterdam and Antwerp were, in fact, owned by PAKRI.

12.    Accordingly, PAKRI has told two polar opposite tales as to the ownership of the same bunkers to three different courts for the purpose of obtaining whatever advantage it sought to be gained by either admitting or disowning ownership of the assets.

13.    The Estonian arrest of Pakri's bank accounts was lifted on the evening of 25 April before our Estonian lawyers had had an opportunity to resist Pakri's application to vacate. At no time have Pakri offered to provide any security for Ayres's claim.

14.    It is denied that the timing of the arrest of the bunkers was purposely made on a Friday so as to cause maximum disruption to PAKRI TANKERS. In fact, it was Pakri's spurious challenges to the arrests that caused the vessels to be delayed. (The Rotterdam judge even heard their challenge on a Saturday morning.) Steps were taken by



AYRES to minimize any delay or disruption pending the posting of alternative security by PAKRI.

15.     The Estonian arrest having now been lifted (much sooner than the one month which Mr. Savins suggested it would take), it is inaccurate to say, as claimed by Mr. Savins that PAKRI has no cash flow.

16.     In fact, PAKRI admits that it currently has six vessels under charter and is required to pay charter hire to the owners as well as furnish the vessels with fuel oil and pay other related expenses.    That only $215,000 was frozen in the three accounts in Estonia suggests either that PAKRI has significant other assets which were not restrained via that action – or that PAKRI is immensely under-capitalized in respect of its volume of business.

17.     If PAKRI is indeed as cash strapped as Mr. Savins claims, owning no ships and having very little in the way of cash, that is a significant factor which the Court should take into consideration in determining whether counter-security should be ordered in that if PAKRI is teetering on the brink, there is a substantial likelihood that PAKRI will not be around at the conclusion of the arbitration (which is expected to take at least another year) and AYRES will have no recourse in order to satisfy an arbitration award in its favor.

18.     Turning to PAKRI's arguments that AYRES' claims are "meritless, speculative or unripe", I can say that this is not true both as a matter of fact and as a matter of English law.    I respectfully refer the Honorable Court to the Defence and Counterclaim submitted to the London arbitrators on behalf of AYRES, a copy of which



is attached hereto as Exhibit B, which demonstrates that the claims made by AYRES are meritorious.

19.     Specifically addressing the issues raised by PAKRI in respect to the AYRES' claims I note the following:

(a) future lost earnings - It is certainly not the case, as PAKRI and Mr. Savins seem to suggest, that AYRES is unable to pursue its claim, and obtain security for same, until June 2009 (when the charter between AYRES and PAKRI would have concluded save for PAKRI's breach). The London Arbitrators are empowered to award damages, and a claimant is entitled to obtain security, in respect of future unaccrued claims based upon proofs submitted by the claimant setting forth the damages  as best as can be reasonably estimated. This is commonly done by relying on expert evidence as to the market for the vessel. Thus, as a matter of English law AYRES is entitled to pursue its claims for future damages despite the fact that the damages are presently somewhat uncertain in amount.  PAKRI and Mr. Savins in particular ignore the fact that while the $987,500 is an estimate as to AYRES's future losses resulting from PAKRI's improper breach of the charter, these claims will become more certain as time passes during which the arbitration will progress. I would add that the loss is not based on a figure "plucked from the air" by AYRES, but on advice from chartering brokers experienced in the chemical tanker trade. These brokers include Nitram of Holland and Clarksons of London, who maintain that the market rate for the "FORTUNE" for a long term charter akin to the PAKRI charter is about US$10,500 per day.



Furthermore, Pakri completely ignores the clear loss of income of about US$312,000 over the period from 28 December 2007, when Pakri ceased paying hire, until 21 January 2008, when alternative employment was found.

(b) O.W. Bunker Charter - Mr. Savins suggests that there was no loss sustained by AYRES during the period January 21 – February 21, 2008, however, this allegation is simply indefensible.  As set forth at ¶16 and 17 of the counterclaim, AYRES earned freight in the sum of $623,420 during the above period and incurred expenses in performing the voyage in the sum of $384,781 for a profit of $238,639, representing a daily hire rate of $12,457.48. The rate under the charter with PAKRI was $13,000 a day.  Taking the $542.50 difference times 30 days results in a loss to AYRES of $16,275.60. Accordingly, the claim is in no way frivolous.

(c) Unpaid Fuel Invoices.  AYRES has withdrawn this claim in the arbitration and an adjustment in the amount sought in counter-security, as outlined below, has been made.

(d) Chartering Broker's commission. AYRES claims the sum of $9,750 in respect of hire commission which they mistakenly both paid to the brokers, Clarksons, and failed to invoice to PAKRI initially. Whilst they accept that commission is their responsibility under the charter party, nevertheless this has resulted in an under-payment of hire in like amount, which PAKRI have nevertheless refused to pay, despite requests.

(e) AYRES further claims the sum of $880 in respect of fresh water supplied to the vessel at Rouen for tank cleaning, and a further $1,600 for tank cleaning



performed by the crew (both pursuant to Additional Clause 45 of the charter party).

(f) Additional Tugs. Under clause 7 of the charter party tugs are for PAKRI's account, but my clients faced threats and demands from the tug company concerned because PAKRI failed to pay them. AYRES has, however, now been informed by the tug company that it has been paid. Accordingly, AYRES no longer maintains its claim against PAKRI in respect to the tug expenses and AYRES has made an adjustment in the amount sought in counter-security.

20.    Following the release of the PAKRI bank accounts in Estonia, AYRES has security in the sum of $222,452.00 initially restrained in New York and now held in London escrow; plus $150,000 (provided as security for the bunkers which were arrested in Rotterdam) and Euros 37,000 for the bunkers arrested in Antwerp for its counterclaim which is now $1,253,005.60.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and information.

Executed at London, England
on April 30 , 2008.

_____
KEVIN SACH

# Exhibit A

## Sach Declaration in Further Support



**ace europe**

ACE European Group Limited

ACE Building
100 Leadenhall Street
London
EC3A 3BP

+44 (0) 20 7173 7000 tel
+44 (0) 20 7173 7800 fax

www.acelimited.com
www.aceeurope.com

Pakri Tankers OU
c/o Davies Johnson & Co
The Old Harbour Office,
Guy's Quay,
Sutton Harbour Plymouth
Devon PL4 0ES

**ACE Guarantee No 48UK504155**

date:    26 March 2008

Dear Sirs

**PAKRI TANKERS OU –v– AYRES SHIPPING INC et al – UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK - 08 CV 2424 (GBD) C/P DATED 19 JANUARY 2007 ("the C/P") - MT "FORTUNE"**

In consideration of your agreeing (i) forthwith to release the Order of Maritime Attachment and Garnishment that you have obtained against the Defendants in the above action before the United States District Court of the Southern District of New York and all funds currently attached in various banks in the United States pursuant to the said Order; and (ii) to refrain from hereafter arresting or attaching or otherwise interfering anywhere in the world with any property or asset of any of the Defendants to the above action; we, Ace European Group Ltd, agree and undertake to pay to you such sum or sums in respect of your claims under the C/P against Ayres Shipping Inc as may be awarded by final, unappealable award of the London arbitration Tribunal already constituted for the purposes of determining claims under the C/P, or, in the event of any appeal therefrom, by the High Court in London, or as may be agreed to be payable to you by Ayres Shipping Inc in respect of your said claims, PROVIDED ALWAYS that our liability hereunder shall not exceed US$ 3,749,086.40 (three million seven hundred and forty nine thousand and eighty six United States dollars and forty cents) inclusive of interest and costs.

This guarantee is given by us without prejudice to all and any rights and defences of Ayres Shipping Inc and the other named Defendants in relation to both the New York Attachment proceedings and the London arbitration.

This obligation is subject to the following provisos:

1.    If any Arbitral Tribunal or Court of competent jurisdiction enters an Order ruling that any Order of Attachment in the captioned matter is vacated, void or reversed, then this guarantee shall be null and void and of no effect.

2.    If any Arbitral Tribunal or Court of competent jurisdiction enters an Order ruling that any security permitted to be obtained by Pakri pursuant to the Order of Attachment

ACE European Group Limited
Registered in England Number 1112892
Registered Office as above
Authorised and Regulated by the Financial Services Authority



## ace europe

issued in the captioned matter is to be reduced, then our obligation under this guarantee shall be reduced accordingly.

3. If Pakri obtains or serves from any court anywhere in the world any Order of Attachment or Arrest of any property or asset belonging to Ayres Shipping Inc or any of the Defendants to the New York Attachment proceedings subsequent to the date of this guarantee with regard to the subject matter of the complaint filed in 08 Civ. 2424 in the New York federal court and/or the claims made by PAKRI TANKERS OU in its 20 February 2008 submissions in the pending London arbitration, then this guarantee shall be null and void and of no effect.

This guarantee is to be construed in accordance with English law and any dispute arising out or in connection with it shall be determined by the High Court of Justice in London.

Signed on behalf of ACE European Group Limited this 26th day of March 2008

By

**D. J. FISHER**
Authorised Signatory

Authorised Signatory of ACE European Group Limited

2

# Exhibit B

Sach Declaration in
Further Support

Mr W. Robertson

Mr B Williamson

your ref:

our ref:

attention:

date:        **25 APRIL 2008**

Dear Sirs

**"FORTUNE" – C/P 19/01/07**

As you are aware, we act for Ayres Shipping Inc, the Owners of the above vessel.

Please treat this letter as Owners' defence and counterclaim submissions in response to Charterers' claim submissions dated 20 February 2008.

**BACKGROUND**

1.  Before addressing the many allegations made against Owners in the Claim Submissions, we suggest that it may be helpful to summarise the dispute and put it into context.

2.  MT "FORTUNE" is a 1989-built chemical tanker of some 11013 grt. She was previously managed by Laskaridis Shipping Co Ltd of Athens, Greece before being transferred to Riga Transport Fleet of Latvia in October 2007. She underwent a conversion to double hull in Shanghai in May 2007.

3.  As Charterers have said, the C/P in question was on the amended "Shelltime 4" form and was intended to run for a period of 24 months, 30 days more or less in Charterers' option (cl.4). However, they purported to terminate the C/P in late December 2007, about 7 months after delivery took place in May 2007, on the basis of clause 3 (iii). In support of that decision, they relied on lists of alleged *"defects"* in the vessel which had been compiled by two of their representatives, Mr Judins and Capt Smorodinovs, following visits to the vessel, first of all by Mr Judins in July and then again in November, and then by Capt Smorodinovs in December 2007.

4.  These alleged *"defects"* had not given rise to any complaints from any cargo interests throughout the time the vessel was trading under the C/P, and Charterers themselves made no complaints about the vessel until late 2007 when this dispute first began. Indeed, Owners had not seen Mr Judins's July report before the Claim Submissions were served. Furthermore, at the time of Capt Smorodinovs's visit to the vessel in December, she was in fact undergoing her CDI (Chemical Distribution Institute) inspection in Klaipeda. This is the most stringent inspection that a chemical tanker must pass in order to be able to trade. The vessel passed this test. She also underwent at Klaipeda at this time a detailed inspection by Port State Control, which she also passed.

5. ~~Owners deny that Charterers were entitled to terminate the C/P~~, whether on the basis of clause 3 or at all. They counterclaim damages for Charterers' wrongful repudiation of the C/P, as set out in detail below, the market for this vessel having dropped below the C/P rate.

6. The Claim Submissions are in large part a repetition of the findings of the two representatives which are attached to the Submissions as Attachments 2-4. They are however distinctly lacking in material particulars, and we are serving a Request for Further and Better Particulars with these submissions. In particular, it is not clear to Owners whether each of the 56 items that Charterers complain about are maintained, or whether, as Owners had understood from their exchanges with Charterers prior to this arbitration, the list of items had been reduced to 27 items. Further, it is not clear whether Charterers' case is that these items entitled them to terminate the C/P, and, if so, how and why.

7. In order for them to succeed with their claim, Charterers must prove – and the burden is clearly on them to do so - that Owners were in breach of their obligation under clause 3 (i) to exercise due diligence to maintain the vessel to the standard set out in clauses 1 and 2(a).

8. This requires them to prove that, contrary to clause 1 and by virtue of the alleged defects, the vessel was: (a) not classed; or (b) not fit to carry the contractual cargoes as set out in Special Provision V; or (c) not "*tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment in a good and efficient state*"; or (d) with tanks, valves and pipelines not oil-tight; or (e) not in every way fitted for burning the fuel specified at clause 1 (e).

9. Alternatively, it requires them to prove that, in breach of clause 2(a), *at the date of delivery under the C/P* (our emphasis added), the vessel did not have a full and efficient and properly qualified crew, as more particularly set out in the sub-clause. Furthermore, Charterers must prove that the facts and matters complained of by their surveyors (a) constituted a breach of these provisions; and (b) that Owners then failed in their obligation under clause 3 to exercise due diligence to restore or maintain the vessel. Owners put Charterers to strict proof of all facts and matters relied upon and submit that the claim submissions do not even come close to discharging this burden.

10. Insofar as Charterers' list of alleged defects is concerned, Owners will rely on the report of Mr R.L. Gordon of Gordon Marine at **Tab 1** hereto. In essence, Mr Gordon visited the ship in January 2008 and investigated each of Charterers' allegations one by one. In all material respects, he found them lacking in substance. Owners therefore submit that Charterers' case falls at the first hurdle.

11. At **Tab 2** is a complete set of the exchanges between Owners and Charterers in respect of Charterers' alleged complaints. Owners submit that, if, which is denied, any of the

facts or matters alleged against them gave rise to any breach of clauses 1 or 2 a, they did not fail in their duty to exercise due diligence to restore or maintain the vessel.

12. Accordingly, Owners submit that Charterers' purported termination of the C/P was wrongful and hence their counterclaim for wrongful repudiation is made out.

**DEFENCE**  (references are to the paragraph nos in the Claim Submissions)

13. Paragraph 1 of the claim submissions is admitted.

14. Paragraph 2 is admitted, save that the earliest contractual redelivery date would have been about 25th April 2009 (not 15th), and the latest about 25 June 2009 (not 15th).

15. As to paragraph 3, Owners submit that, if Charterers were in any way dissatisfied with the condition, operation and performance of the vessel during the time they traded her, they kept it to themselves until late 2007 when they sent the November report of Mr Judins to Owners. (As mentioned earlier, Owners did not see the July report until the claim submissions were served.)

16. Pending the provision of Further and Better Particulars of the claim, it is not clear to Owners whether, how or in what respect the facts and matters referred to in this paragraph constitute a breach of charter on their part, and they reserve the right to comment further in due course once Charterers have fully explained their case. For now, Owners would make the following submissions:

a. The fact of the grounding at Padang is admitted, although it was in truth more a case of the vessel touching bottom at the berth designated for her by Charterers owing to lack of draft. This constituted a breach of Charterers' obligation to provide a safe berth (cl.4 and Special Provision VIII). Owners request that Charterers disclose the Clarksons email of 16 August referred to at sub paragraph ii, as well as full particulars of their allegation that the incident was a result of "*poor communication between the vessel and the shore*".  In any event, this issue was fully and finally resolved by mutual agreement of the parties at a meeting in Riga on 31st October 2007 – see **Tab 3**.

b. The insinuation that Owners had to be pressurised by Charterers into arranging inspections is denied, as is the allegation that Shell and Statoil declined to approve the vessel. The correspondence at **Tab 4** refers.

Special Provisions II – "*Oil Major Approvals*", and VI – "*Oil Major Vetting*" are relevant here. The former provides:

"*None – vessel has not been trading in areas or with cargoes of interest to oil majors.*"

The latter provides:

> *"Owners will invite/request inspectors from Stasco, BP and Chevtex at their risk, cost and expense to inspect the vessel within 6 months of delivery of the ship to Charterers.If Owners are unable to obtain approval of the ships by the named majors within that period, then the hire will be reduced by $usd 50.00 per day per approval. Owners will exercise due diligence in obtaining/attempting to get such approvals, subject to Oil Majors willingness to inspect vessel due to geographical location, trading pattern, cargoes being carried and availability of inspectors. ...."*

The truth of the matter is that Statoil both inspected and approved the vessel – see the documents at **Tab 5**. Shell did decline the vessel, but only because she is over 15 years old and has no Inert Gas System.  In this regard, Owners and Charterers applied the terms of Special Provision VI and reduced the hire with effect from November – see **Tab 6**.

c. Owners have no knowledge of any refusal by Engen to charter the vessel. Further particulars and supporting evidence is awaited. Even if they did, Owners deny that this would constitute a breach of C/P on their part, and put Charterers to strict proof in this regard                                                        .

d. Owners have no knowledge of the facts and matters alleged here, as to which they again put Charterers to strict proof, and will reserve their position pending receipt of proper particulars of Charterers' case and relevant supporting evidence. Owners would ask the Tribunal to note that Alexelar Logistics is the holding company of Charterers.

17. As to paragraph 4, Owners will rely on the report of Mr Gordon and on their document at Appendix 8 thereto (their comments on Capt Smorodinovs's report) in order to deny/refute all of Charterers' allegations. In addition, however, they comment as follows:

a. Pending receipt of particulars of the inspection and the cargoes for which the tanks were allegedly found to be unsatisfactory, and without prejudice to their right to comment further once this information has been provided by Charterers, Owners would refer the tribunal to the DNV Executive Hull Summary at **Tab 7** which shows that the centre tanks were all found to be in good condition upon inspection in May 2007, and to the DNV List of Products dated 14 November 2007 at **Tab 8** which shows that the vessel was in fit to carry more cargoes than the range specified in Special Provision V of the C/P, which provides:

*"Cargoes*

*In accordance with C.o.F and coating manufacturer's resistance and carriage manual. Always within vessel's natural segregations, coating and lines capabilities, excluding Tall Oil and its derivatives.*
*Owners to rvert with maximum heat carriage capability of vessel.*

*Intention: Vegoils, tropical oils, ethanol, easy chemicals, clean petroleum products unleaded, dirty petroleum products.*

*No carriage of crude oil or leaded products is permitted under this charter,"*

b. The auxiliary boiler was repaired in October – December 2007 – see the documents at **Tab 9.**

c. Owners do not understand how or why a 3-hour main engine breakdown can be grounds for terminating the C/P.

d. Owners repeat their comment above insofar as the alleged problems with the auxiliary engines are concerned, which are in any event denied. Without prejudice to the foregoing denial, Owners would add that it is not possible to use the shaft generator in port, since it is not possible to use the main engine in port.

e. Solidification of cargo in the pipelines in low ambient temperatures is a common phenomenon with temperature-sensitive cargoes, and has nothing to do with boilers. Owners put Charterers to strict proof as to how this can be deemed a breach of C/P and of any complaints from cargo receivers concerned.

f. Pending full particulars, Owners reserve their position in relation to this complaint. In any event, however, Mr Judins had no right to give instructions to the crew in the management and operation of the vessel.

g. Owners reserve their position pending receipt of full and proper particulars of the facts and matters alleged, and put Charterers to strict proof of same. It is however denied that there was any leakage or malfunction of the cargo valves whether as alleged or at all.

h. It is denied that the crew had a lack of knowledge of or training in chemical tanker operational procedures, or were incompetent in any respect, whether as alleged or at all. Further and in any event, the reference to a "QMS" manual is not understood. Charterers are put to strict proof of these allegations and their relevance.

i. – o. These items are denied and will be covered, to the extent necessary and relevant, by witness statements in due course.

18. As to paragraph 5, this is the only cargo claim to result from the 7 months trading that the vessel carried out under the C/P. Owners deny liability for the claim, and that the vessel was off-hire because of it. The cargo claim has yet to be determined as between the receivers and Owners, and Owners will seek an indemnity from Charterers in the event that they are found liable, the cause of the damage having been Charterers' stowage plan. Once again, Charterers are asked to explain why and how this matter could give rise to any breach of clause 3.

19. As to paragraph 6, until 19th October 2007, the vessel was managed by Laskaridis Shipping and hence was covered by their DNV bunker analysis program. However,

when the management of the vessel was transferred to Riga Transport Fleet in October 2007, they had no contract with DNV, but set about negotiations with DNV which culminated in the signing of a contract with effect from 1 January 2008 – see **Tab 10**. Charterers were told of this at the meeting in October and expressed no concerns. In the interim, the vessel continued to use the Laskaridis DNV program.

20. As to paragraph 7, there was no indication given to Owners that Mr Judins was returning to the vessel because Charterers were in any way dissatisfied with the vessel. Furthermore, Mr Judins gave no such indication to the crew during his inspection. Owners will say that Mr Judins was commissioned by Charterers, who by now were experiencing obvious financial problems, as evidenced by, for example, their failure to pay for bunkers and other services supplied to the vessel, which caused the suppliers to demand payment from Owners, to find a pretext for them to terminate the C/P for purely commercial reasons. (See **Tab 11** and Owners' message to Charterers of 24/12/07 which clearly encapsulates their position.)

21. As to paragraph 8, Owners request a copy of any written communication from Charterers to this effect.



22. As to paragraph 9, Owners deny that Charterers are entitled to reimbursement of the said tug costs, which are for their account under cl.7, and request Charterers to explain why they believe they are so entitled and whether they maintain that this issue entitled them to terminate the C/P.

23. As to paragraphs 10, 11 and 12, Owners will rely on the findings of Mr Gordon and, In due course, witness evidence to deny the allegations made by Capt Smorodinovs (whom Mr Gordon has incorrectly identified in his report as *"Mr Smorolinov"*) and whose technical qualifications and general competence and expertise they will put in issue. Owners repeat that, at the time of Capt Smorodinovs's inspection, the vessel was undergoing her CDI inspection, in which the crew were heavily engaged, and which she passed. It is inconceivable that she would have done so had she been suffering from any serious defect. It is also to be noted that Capt Smorodinovs spent only 3 hours on board the vessel.

24. As to paragraph 13, Capt Smorodinovs's report at Attachment 4 to the Claim Submissions is not the final version, in that it does not incorporate all of Owners' comments. A true copy of the final document is at Appendix 8 of Mr Gordon's report. It shows that the list of alleged defects had by now been reduced to 27, and Mr Gordon deals with each of them in turn. Owners adopt his conclusions and deny that any of the matters complained of by Charterers were of any substance and/or entitled them, whether individually or collectively, to terminate the C/P.

25. As to paragraph 14, it is not clear what allegation Charterers are making. Owners reserve their position accordingly.

26. As to paragraph 15, as already pleaded above, Shell rejected the vessel because she did not meet their basic criteria primarily as to age, and there is no evidence that Engen or Alexelar (Charterers' parent company) had negotiated any charter of the vessel. Furthermore, the vessel carried all cargoes for about 7 months successfully and without complaint, save for the incident at Yuzhny, which Owners will say was Charterers' responsibility in any event, and, as already pleaded at paragraph 14 b, the C/P contained a code for dealing with oil major approvals which was applied by both parties. Owners were not in breach. Accordingly, Charterers' allegations are denied.

27. Paragraph 16 is denied for reasons already pleaded at paragraph 15 above.

28. Paragraph 17 is denied. The crew were all properly qualified as per STCW 95.

29. As to paragraphs 18 and 19, it is denied that any of the allegations relied on by Charterers gave rise to any breach on Owners' part and/or entitled them to put the vessel off-hire and/or to terminate the C/P. Charterers are requested to provide a copy of any notice given by them to Owners pursuant to clause 3.

30. As to paragraph 20, the fact that hire was due over a weekend does not relieve Charterers of their obligation to make timely payment. Owners therefore rightly exercised their lien for unpaid hire, and the vessel was not off-hire.

31. As to paragraph 21, Owners admit the bunker quantities ROB on redelivery, but will seek to set off the value thereof against their counterclaims herein. (In fact, Owners offered to pay this amount into escrow, but Charterers rejected the offer.)

32. As to paragraph 22, as previously stated above, any evidence as to "*opportunities to fix the vessel to Engen and Alexelar/Trafigura*" and/or of their reasons for not taking the vessel on charter is conspicuous by its absence and the claim is denied. Owners put Charterers to strict proof of all matters relied upon and repeat their request for all supporting documents. Owners will in any event rely on Special Provisions II and VI to exclude them from all and any liability, as already pleaded.

33. In the premises, the claim is denied in toto and should be dismissed with an award of costs in Owners' favour.

**COUNTERCLAIM**

34. Owners repeat their Defence.

35. For the reasons set out above, Charterers' termination of the C/P was wrongful. By emails dated 27th December 2007 and 2nd January 2008 (**Tab 12**), Owners accepted Charterers' conduct as repudiatory and brought the C/P to an end without prejudice to their right to claim damages.

## PARTICULARS OF LOSS AND DAMAGE

36. The C/P was supposed to run until 25th April 2009 at the earliest. It came to an end on 27th December 2007. Owners are entitled to the difference between the market rate and the C/P rate over the balance of the C/P period, after giving credit for earnings from substitute employment.

37. Charterers paid hire until 28th December. From that date until 21st January 2008, Owners earned no income, resulting in a loss of **US$312,000** (24 days @ 13,000 per day).

38. On 21st January, the vessel arrived at Copenhagen and was delivered to a substitute charterer, OW Bunker and Trading, for a voyage to West Africa with clean petroleum products. The vessel was redelivered on 21st February. Owners earned net freight of US$623,420.64 and a net profit of US$238,639.64, equivalent to a t/c daily rate of US$12,457.48, as set out in the Voyage Result at **Tab 14**. Accordingly, they claim the difference between this and the C/P rate of US$13,000, or US$542.52 for 30 days, amounting to **US$16,275.60**.

39. Subsequently, in further mitigation of their loss, Owners entered into a time charter with Gateway International Shipping S.A for an initial period of 30 days @ US$13,500 per day, with Gateway having the option to extend the C/P for two further periods of 30 days and then for 3 months (plus or minus 10 days) with 3 further periods of 3 months. Thus far, Owners have performed the first 30 days and Gateway have exercised their option until the end of May. There has been no indication that they intend to extend the C/P beyond this date. If the vessel is redelivered by Gateway at the end of May, then Owners will have a further 12 months until the C/P with Charterers would have ended. In January 2008, Owners received advice from brokers that the daily rate for long term charters of this type was about US$10,500, thus producing a loss of US$2,500 per day for 12 months or **US$912,500**.

40. As evidenced by Owners' invoice of 16 January 2008 at **Tab 15**, Owners further claim the sum of **US$9,750** in respect of hire commission which they mistakenly both paid to the brokers, Clarksons, and failed to invoice to Charterers initially. Whilst they accept that commission is their responsibility under the C/P, nevertheless this has resulted in an under-payment of hire in like amount, which Charterers have nevertheless refused to pay, despite requests.

41. Owners further claim the sum of **US$880** in respect of fresh water supplied to the vessel at Rouen for tank cleaning, and a further **US$1,600** for tank cleaning performed by the crew (both pursuant to Additional Cl.45).

And Owners claim:

1. Pursuant to paragraph 37, US$312,000;
2. Pursuant to paragraph 38, US$16,275.60

3. Pursuant to paragraph 39, US$912,500; alternatively damages to be assessed;
4. Pursuant to paragraph 40, US$9,750;
5. Pursuant to paragraph 41, US$880 and US$1,600;
6. Interest pursuant to the Arbitration Act 1996;
7. Costs.


Yours faithfully



**SACH SOLICITORS**

**encs**